# EXHIBIT B

**ZETLIN & DE CHIARA LLP**
Loryn P. Riggiola, Esq. (Attorney ID: 029041988)
Anazette Ray, Esq. (Attorney ID: 031242002)
80 Bloomfield Avenue
Caldwell, New Jersey 07006
(973) 364-9900
*Attorneys for Plaintiffs Newark Warehouse Urban*
*Renewal, LLC and Newark Warehouse Redevelopment*
*Company, LLC*

|  |  |
|---|---|
| NEWARK WAREHOUSE URBAN RENEWAL, LLC and NEWARK WAREHOUSE REDEVELOPMENT COMPANY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>HOLLISTER CONSTRUCTION SERVICES, LLC, CHRISTOPHER JOHNSON, KIERAN FLANAGAN, BRENDAN MURRAY, JOHN DOES 1-100, JANE DOES 1-100, AND XYZ CORPORATIONS 1-100,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION:  ESSEX COUNTY<br><br>Docket No. ESX-L-<br><br>Civil Action<br><br>**COMPLAINT** |

The Plaintiffs, NEWARK WAREHOUSE URBAN RENEWAL, LLC and NEWARK WAREHOUSE REDEVELOPMENT COMPANY, LLC (are also referred to individually and collectively as "Plaintiffs"), New Jersey limited liability corporations, by way of a Complaint against the Defendants, HOLLISTER CONSTRUCTION SERVICES, LLC ("Hollister"), , CHRISTOPHER JOHNSON ("Johnson"), KIERAN FLANAGAN ("Flanagan"), BRENDAN MURRAY ("Murray"), John Does 1-100, Jane Does 1-100, and XYZ Corporations 1-100 say:

## BACKGROUND AND THE PARTIES

1.      This action arises from a project ("the Project") involving the renovation of a former warehouse building ("the Building") by Plaintiffs, which Building is located at 110 Edison Place, Newark, New Jersey 07102. Plaintiff Newark Warehouse Redevelopment Company, LLC

("NWRC") owns the Building.  Plaintiff Newark Warehouse Urban Renewal, LLC ("NWUR") is the ground lessee.  Both NWRC and NWUR are affiliates of Edison Properties ("Edison").

2.     The scope of the Project that Hollister was to perform included the renovations of the core and shell portion of the Building compromising a basement, six (6) stories and a penthouse addition which was newly constructed, all comprising approximately 410,000 gross square feet. Hollister also served as the contractor on two other projects commonly referred to as the Columbia Street project and the Edison Headquarters project.

3.     On or about April 20, 2017, Plaintiffs entered into an Agreement For Construction Management Services And Guaranteed Maximum Price ("the Contract") with Defendant Hollister Construction Services, LLC ("Hollister") pursuant to which Hollister was to provide certain construction management services for the Project and the basis for payment was the cost of the work plus a fee with a guaranteed maximum price ("GMP"). The GMP also included a cap and guarantee. The completion date for the Project of September 1, 2018.

4.     Pursuant to the Contract, Hollister was obligated to perform the work in strict accordance with the contract documents and ensure that all subcontractors and vendors were paid and if a subcontractor filed or caused to be filed any lien against the Project, then Hollister, at its sole cost and expense, was obligated to cause such lien to be canceled and discharged of record by payment, bonding or otherwise.

5.     Hollister breached its obligations and failed to comply with the terms of the Contract by not paying certain subcontractors and suppliers, not bonding certain lien claims, and not completing the Project by the contractual completion date and extensions granted thereafter inasmuch as the Project is still ongoing  Hollister has abandoned the Project, leaving one (1) person on site to create the impression of non-abandonment.  Plaintiffs have been forced to take over the

Project and complete the work. Hollister also breached its obligations by failing to perform and provide services, supplies and equipment as agreed and provided for in the Contract Documents as defined in the Contract.

6.      Based upon Hollister's representations that it would make amends and complete the Project, pay all subcontractors and vendors and bond all liens, Plaintiffs agreed not to terminate Hollister and take over the Project, and, instead, entered into an Amendment to Construction Management Agreement dated January 26, 2019.  Hollister also agreed to the Substantial Completion of floors 5, 6, and 7 on or before February 28, 2019  and the entire Project no later than April 15, 2019 ("the Amendment").

7.      On July 1, 2019, four (4) months after ownership had advised that these floors would be ready, the tenant for floors 5, 6, and 7 took possession of said space when the floors were still incomplete as the tenant could not wait to utilize the space any longer.  As mentioned, to date, the Project, including floors 5, 6, and 7, remains incomplete and Hollister has effectively abandoned the Project.

8.      Defendant Christopher Johnson ("Johnson") is the founder and a Principal of Hollister who oversees the day-to-day operations of Hollister's construction services practice.

9.      Defendant Kieran Flanagan ("Flanagan") is the co-founder and a Principal of Hollister who oversees the day-to-day operations of Hollister's construction services practice.

10.     Defendant Brendan Murray ("Murray") is the President of Hollister who provides direction to the Hollister employees and was responsible to review payment requisitions.

11.     Johnson, Flanagan and Murray were involved in the negotiation of Hollister's services and the management of Hollister's services as same relates to the Project, and at the time

they caused Hollister to induce Plaintiffs to enter into the Amendment, they knew they were not going to honor the terms of the Amendment.

12.     John Does 1-100 is one or more individuals that have yet to be identified that might be liable to Plaintiffs for the acts complained therein.

13.     Jane Does 1-100 is one or more individuals that have yet to be identified that might be liable to Plaintiffs for the acts complained herein.

14.     XYZ Corporation 1-100 is one or more other business entities that have yet to be identified that might be liable to Plaintiffs for the acts complained herein.

## JURISDICTION AND VENUE

15.     The Superior Court of New Jersey, Law Division, Essex County has jurisdiction to decide all matters set forth herein.

16.     Pursuant to *R.* 4:3-2(a) and *R.* 4:53-2, venue is appropriately laid in the Superior Court of New Jersey, Law Division, Essex County.

## FACTS COMMON TO ALL COUNTS

### A. The Project

17.     In 2015, NWRC took title of the Building located at 110 Edison Place, Newark, New Jersey 07102.  NWRC granted a lease of the Building to NWUR as of August 1, 2017.

18.     In 2016, NWRC planned to undertake the Project – the redevelopment of the Building, which would involve the repositioning of a former warehouse located on the property and the renovation of same.  Upon the ground lease of the building to NWUR, NWUR took over the redevelopment activities.

19.     Perkins Eastman Architects DPC ("Perkins") was retained to serve as the Architect and render design and related services with respect to the Project.

4

### B.  Hollister's Pre-Construction Services

20.     On or about October 25, 2016, pursuant to a Letter of Intent ("LOI"), Plaintiffs retained Hollister to perform certain pre-construction work in accordance with a Pre-Construction Work Contract.

21.     Pursuant to same, Hollister was to attend all design meetings, offer value engineering suggestions and pricing, provide estimating services and general assistance through the design and pre-construction process and general oversight to the Plaintiffs-procured asbestos abatement contractor.

22.     In the LOI/Pre-Construction Work Contract, Plaintiffs and Hollister expressed their mutual intent to discuss the possibility of entering into construction management agreement where Hollister would serve as the Project's Construction Manager.

### C.  Hollister's Construction Management Contract and Responsibilities

23.     On or about April 20, 2017, Plaintiffs and Hollister entered into the Contract wherein Hollister was named the Construction Manager and it was agreed that Hollister would provide certain construction management services for the Project for a constant management fee of 2.5% of the construction costs of the GMP.  Hollister commenced its work on this date.

24.     The contractual GMP for the Project was approximately $43,810,398.78.

25.     As set forth in Section 2.1, Trust and Confidence, of the Contract, Hollister accepted "the relationship of trust and confidence established between it and NWUR."  In the same Section 2.1, Hollister likewise agreed that it was responsible for all subcontractors and it specifically agreed to:

> furnish efficient business administration and superintendence and to cause the Sub-contractors (a) to furnish at all times an adequate supply of skilled workers and first-quality materials and defect-free workmanship and (b) to perform, or cause to

be performed, the Work in an effective and sound way and in an expeditious and economical manner consistent with the interests of the Plaintiffs.

26.     Section 2.1 also provided that Hollister's representations and warranties to Plaintiffs were "a material inducement to … to execute this Agreement … and … shall survive the execution and delivery of this Agreement, any termination of this Agreement and the final completion of the Work." Representations and warranties made by Hollister included, but were not limited, to: 1) Hollister was financially solvent and able to pay its debts, comply with its payment obligations and had sufficient working capital to complete the Work and perform all obligations; 2) Hollister was able to furnish all tools, materials, supplies, equipment and labor through subcontractors; and 3) Hollister would perform the Work with care, skill and diligence. Hollister failed to abide by these representations and warranties.

27.     In accordance with Section 12.2 of the Contract, Hollister was required to retain and pay all subcontractors and suppliers utilizing the funds it received from Plaintiffs.  In the event that Hollister withheld any payment to any subcontractor, it was required to immediately report such withholding and its reason to Plaintiffs.

28.     Section 12.9 of the Contract provided that if a subcontractor files or causes to be filed any lien against the Project, then Hollister, at its sole cost and expense, shall cause such lien to be canceled and discharged of record by payment, bonding or otherwise.

29.     In Section 2.2.2, Hollister further agreed to be solely responsible for all construction means, methods, techniques, sequences and procedures for the construction activities to be performed pursuant to the Contract.

30.     Pursuant to the GMP schedule, on April 20, 2017, Hollister agreed to commence its construction activities for the Project.  In Section 3.1 of the Contract, Hollister agreed to work diligently to achieve Final Completion of the Work by September 1, 2018 as set forth in the GMP

project schedule.  Except for Excusable Delay (as defined in Section 1.1.37), Hollister was not to change any dates for completion of any portion of the work in the GMP Project Schedule without the prior written approval of Plaintiffs, which approval could be withheld by Plaintiffs at its sole discretion.  Likewise, unless Plaintiffs approved in writing, no other project schedule could be used by Hollister to vary the terms of the GMP Project Schedule.

31.     In Section 3.6 of the Contract, Hollister acknowledged that time was of the essence.

32.     In addition, in accordance with Section 3.6 Hollister agreed that if the Project was not completed within 16 months of the Notice to Proceed, then Plaintiffs would "suffer significant damages." As set forth in Section 3.6, Hollister agreed that if Hollister failed to achieve Substantial Completion by the date set forth in GMP Project Schedule then Hollister would be responsible to pay: a) any additional insurance premiums required; b) absorb any General Condition Costs incurred as a result of the day; c) pay liquidated damages ("LDs") according to the schedule in the agreement which first permitted a 30 day total grace period before LDs were assessed.

33.     Section 3.7 of the Contract provided that:

> should Construction Manager be delayed or disrupted in performing the Work hereunder for any reason, Construction Manager shall promptly and in no evet more than five (5) Business Days after the commencement or discovery of any condition, whichever is later, which is causing such delay (including Excusable Delays) or disruption notify Plaintiffs in writing of the effect of such condition upon the GMP Project schedule…Failure to provide such notification shall, to the extent that Plaintiffs is prejudiced thereby, constitute an unconditional waiver by Construction Manager of any right to a time extension…Failure to strictly comply with this notice requirement shall, to the extent that Plaintiffs is prejudiced by such failure, be sufficient cause to deny Construction Manager any request for relief arising from a delay, including a time extension, and to require Construction Manager to conform to the GMP Project Schedule then in effect.

But for one Change Order, Hollister made no requests for extensions of time from Plaintiffs.

D. **Hollister's Mismanagement of the Project**

34. After the commencement of the Project, Hollister demonstrated its inability to adequately manage the Project.

35. For example, in early September 2017, Hollister was required to provide prototype windows for testing. As of September of 2017, Plaintiffs knew the windows would be a problem and advised Hollister to monitor this issue. However, as of October 12, 2017, Hollister had yet to provide the prototype windows. Almost all trade was behind schedule. By December of 2017, Plaintiffs advised Hollister to replace the window subcontractor due to delays, the subcontractor's failure to first test the windows, and its failure to honor other commitments. Hollister refused to replace the window subcontractor.

36. On December 11, 2017, despite Hollister's failure to inform Plaintiffs of delays, Plaintiffs issued Hollister a Notice of Delay based on significant delays from the November 16, 2017 project schedule. At this point, there had been delays in the structural work, saw cutting and steel erection. The delays in the demolition, saw-cutting and steel work were causing delays in other trade subcontractors, namely trades related to the Building core work.

37. The December 11, 2017 Notice stated that, as of December 21, 2017, nine (9) months of the Project schedule had been utilized and there was only be seven (7) months remaining in the Project schedule. However, as of that date, the Project was nowhere near 56% completion. In fact, at this time, only 20% of the work had been completed by Hollister.

38. Due to these delays, and in an attempt to get the Project back on schedule, on December 15, 2017, Plaintiffs suggested that Hollister accelerate the work by adding additional/supplemental subcontractors who would work in three (3) shifts or, in the alternative, replace deficient subcontractors. Delays on a project which affect the overall completion date for

a project are termed critical path delays. Delays on a project which do not affect the overall completion date of a project are called concurrent delays. Unfortunately for the Project, the delays caused by Hollister were all critical path delays.

39. Hollister rejected Plaintiffs' suggestion to replace the metal and glass subcontractor. Hollister did supplemental the subcontractors but provided these subcontractors with little or no direction and/or management, no schedules for the completion of their work, and no pricing structure before the mobilization of these additional subcontractors. Instead, these subcontractors were retained in a crisis manner with no direction or notice to Plaintiffs.

40. Plaintiffs' December 15, 2017 letter to Hollister also noted that there were additional delays in the work to be performed by the plumbing subcontractor, and that Hollister still had not advised Plaintiffs as to when the major roof top equipment was expected to arrive at the Building.

41. At this time, the HVAC trade could not deliver major roof top equipment because the steel was not in place. Hollister's failure to complete the penthouse steel work by December 31, 2017, which it had committed to do, was a major issue due to access to the adjacent park construction. The adjacent park construction was delayed by three (3) months as a result of Hollister's delays on the Building.

42. All trades were delayed due to a lack of commitments and coordination on the part of Hollister. At this time, Hollister was issuing updated schedules and missing the completion dates listed in each updated schedule, making these schedules both unreliable and meaningless.

43. On or about December 21, 2017, as a result of non-payment of its invoices, Atlantic Concrete Cutting, Inc. ("Atlantic"), which had contracted with Hollister subcontractor Control Services, LLC ("Control"), filed a Construction Lien on the property in the amount of $340,315.00.

44.     On January 29, 2018, Plaintiffs demanded that Hollister provide a GMP reconciliation detailing how the Project funds Plaintiffs had paid to Hollister had been utilized and how future disbursements were to be made.

45.     On January 31, 2018, as a result of non-payment of its invoices, Drobach Equipment Rental Co., Inc. ("Drobach"), a supplier to Control, filed a Construction Lien on the property in the amount of $52,742.55.

46.     During this time period, Hollister officers Christopher Johnson, Kieran Flanagan, and Brendan Murray ("Hollister's Officers) continued to repeatedly represent and assure Plaintiffs that Hollister would bond all liens and that Hollister would make all efforts to comply with the terms of the Contract.

47.     As of March of 2018, Hollister failed to rectify the delays and the Project was still behind schedule.  In addition to delays with regard to demolition, steel and window work, there were additional delays critical path delays now being caused by the stair and elevator subcontractors.

48.     As was the case from nearly the beginning of the Work, Hollister repeatedly made representations that Hollister would meet the dates in their updated schedules, however, Hollister failed to comply with any of the updates.

49.     In a letter dated March 13, 2018, Plaintiffs demanded that Hollister take whatever measures were necessary to bring the Project on schedule as they were required to do by their contract.

50.     Shortly thereafter, Hollister demanded that Plaintiffs prepay for work not completed, namely the window fabrication. To mitigate damages and keep the Project moving,

Plaintiffs had no choice but to pay for this incomplete work to avoid more delay damages.  On April 5, 2018, Plaintiffs paid Hollister for this incomplete work.

51.     On April 10, 2018, Drobach filed an Amendment to its Construction Lien in the amount of $50,092.83 to reflect that certain invoices had been paid and that new ones were issued for additional rental periods through March 15, 2018.

52.     On or about April 18, 2018, Hollister advised that the metal and glass delivery would be completed by May 15, 2018,  and that Murry had visited Europe to confirm this delivery date.  No such delivery occurred and Hollister provided no solutions to this situation.  As a result, Plaintiffs had to take over a large portion of the metal and glass work.

53.     On April 18, 2018, Hollister further provided Plaintiffs with a time table for the completion of certain metal and glass, widows, openings, curtain wall, fabrication, rail shop drawings work.  Hollister did not abide by these timelines and failed to keep Plaintiffs properly informed as to the status of same.

54.     On or about April 26, 2018, as Hollister had yet to pay Control for its invoices, Control filed another Construction Lien against the property in the amount of $831,746.28.

55.     On or about May 2, 2018, Hollister knowingly and fraudulently advised that it filed Construction Lien Bonds with Arch Insurance Company as surety with regard to the Control invoices and liens, thereby misleading Plaintiffs into believing that the liens were bonded, and Hollister was abiding by its obligations. Much later, Plaintiffs learned, from its own inquiry, that Hollister's representations were false and that not all Construction Lien bonds had actually been filed. To date, Hollister has failed to report and provide copies of all recorded bonds for the outstanding liens.

56.     As of May 2, 2018, the window installation was still grossly delayed.  Due to these delays, Plaintiffs advised that they would hire and direct their own subcontractor to complete the work in the event that Hollister did not demonstrate significant progress in the window installation by May 6, 2018.

57.     In response, on May 2, 2018, Hollister advised Plaintiffs that Hollister had directed its window subcontractor to perform the work, and that its window subcontractor has agreed to increase manpower to accelerate its work.

58.     In May of 2018, Plaintiffs were made aware, by the window testing companies, that either Hollister or the subcontractor(s) were attempting to falsify the window testing results by tampering with the window units to prevent water infiltration in known problematic areas.

59.     At this time, Hollister was also behind its schedule with regard to the completion of the curtain wall and glass work required to enclose the exterior of the Building.

60.     As of June of 2018, Hollister had utilized all of its general conditions' money (the money Hollister was to be paid pursuant its GMP contract) which was to be used for certain indirect expenses to be incurred before, during and after construction, by Hollister as the Construction Manager, yet the Project was still ongoing.   Hollister was not properly managing its fees and costs for the Project, at the same time it was mismanaging the overall construction of the Project.

61.     On June 13, 2018, as a result of the non-payment of its invoices, Apple Coring & Sawing, LLC ("Apple"), a subcontractor of Hollister subcontractor Control, filed a Construction Lien in the amount of $471,082.80.

62.     In July of 2018, Plaintiffs were made aware that Hollister's delay in the curtain wall work was caused, in part, by Hollister's submission of incomplete curtain wall shop drawings and delays in providing the complete and accurate shop drawings.

63.     On July 6, 2018, Apple filed a lawsuit as against Hollister and Plaintiffs which lawsuit sought to foreclose on its Construction Lien.

64.     As Hollister had already received its full contractual payment, on August 7, 2018, Plaintiffs inquired as to how Hollister was to pay for the remainder of the construction activities. Plaintiffs also requested that Hollister provide all information as to all credits due to Plaintiffs.

65.     On September 10, 2018, as the metal and glass work had yet to be completed, Plaintiffs contacted Hollister to inquire as to the status of same.  Hollister did not respond to this inquiry.

66.     As of September 12, 2018, Hollister's window subcontractor still had not completed its work as windows were still failing testing.

67.     Plaintiffs were also made aware that Hollister was behind its schedule with providing Perkins with samples of the louvers, metal panels, spandrel panels, and insulation.

68.     On September 13, 2018, Plaintiffs issued Hollister a formal demand that Hollister take whatever actions were necessary to mitigate Plaintiffs' damages which were accruing as the result of Hollister's mismanagement of the Project.  Specifically, it was demanded that Hollister advise and provide a plan to mitigate unexcused delays and various defaults, accelerate the construction work, provide evidence that Hollister either bonded or discharged any and all subcontractor liens, pay subcontractors for future work, pay for back charges to the design team for the design team's extended construction administration services, provide Plaintiffs with a

reconciliation demonstrating how Plaintiffs' payments to Hollister had been utilized, and recognize Plaintiffs' contractual right to take over construction management of the Project.

69.     Hollister did not respond to Plaintiffs' formal demand.

70.     Accordingly, as a result of the ongoing delays, Plaintiffs had no choice but to retain a steel subcontractor and metal and glass subcontractor to perform the remaining construction activities associated with these trades.

71.     In or around September of 2018, various other Hollister subcontractors were threatening to stop their work as a result of non-payment by Hollister for these subcontractors' invoices.  In order to prevent subcontractors from walking off the job, with Hollister's consent, Plaintiffs began paying certain subcontractors directly via joint checks and demanded a credit from Hollister for these payments.

72.     On September 24, 2018, Hollister confirmed that all Lien Construction bonds had been obtained.  This was not the case.

73.     In or around this time, Hollister submitted Payment Requisition no. 48 ("Requisition 48").  As part of Requisition 48, Murry executed a lien waiver which stated that Hollister had paid its subcontractors.

74.     As of October 22, 2018, Plaintiffs wrote to Hollister as Hollister had failed to respond to all of Plaintiffs' prior requests for the Project reconciliation or issue Plaintiffs credits for Plaintiffs' direct payments to subcontractors.

75.     As of October 22, 2018, Plaintiffs were owed credits of approximately $3,470,081.00 as a result of Plaintiffs' making direct payments to Hollister's subcontractors and as a result of certain work omitted from the Project.

76.     Having received no response to their October 22, 2018 letter, on November 2, 2018 Plaintiffs again wrote to Hollister and demanded certain credits.

77.     On November 14, 2018, as a result of non-payment of its invoices, Leslie Katchen Steel Construction, Inc. ("Leslie"), a Hollister subcontractor which performed certain steel work, filed a Construction Lien in the amount of $936,640.32. However, Leslie was a non-performing subcontractor and Plaintiffs were owed credits of approximately $1,300,000.00 related to Leslie's work.  Hollister mismanaged Leslie's performance and never issued Leslie change orders requiring the issuance of the credits.   Instead, Murray recommended that Plaintiffs continue to pay Leslie, which Plaintiffs refused to do.

78.     Around this time, Hollister requested that Plaintiffs take over a portion of the metal and glass work from its subcontractor because said subcontractor was unable to complete the work. Plaintiffs retained Walsh Metal & Glass ("Walsh") through an extensive  bid process that Hollister was aware of.  Hollister agreed that Walsh should  complete this metal and glass work for an amount which exceeded the amount of funds left for this trade in Hollister's GMP.  As such, Plaintiffs recommended that, in addition to the work to be performed by Walsh, the balance of the metal and glass work be taken away from Hollister's subcontractor.

79.     Despite the repeated verbal assurances issued by the Hollister Officers, as of November of 2018, the Project completion date had passed and the Project was months behind schedule.  There still remained window, metal panel, balcony, louver installation, hardware installation, interior glass, railing, and curtain wall work to be completed.  Metal and glass deliveries were grossly behind schedule.

80.     By this time, Hollister had already replaced its project management team on several occasions, had stopped providing the updated construction schedules as required by the Contract and could not state when it anticipated the Project would be completed.

81.     Hollister was further failing to comply with the Contract by bonding the Construction Liens which had already been placed on the property.

82.     On December 14, 2018, Plaintiffs issued Hollister a Notice of Metal and Glass Work Default, which Notice demanded that Hollister comply with the Contract and commence and continue the correction of the defaulted metal and glass work within seven (7) days.  The Notice further provided that, should Hollister fail to comply with its terms, then Plaintiffs would complete the balance of the metal and glass work and seek a credit for same.

83.     On January 22, 2019, Drobach filed a lawsuit as against Hollister and Plaintiffs which lawsuit sought to foreclose on the Drobach Construction Lien.

**E.  Amendment to the Contract – January 26, 2019**

84.     In an attempt to make it appear that Hollister was escalating the construction activities, Hollister hired additional subcontractors to perform certain work.

85.     On or about January 26, 2019, as a result of negotiations as between the parties, and promises made by Hollister Officers, including the commitment by Hollister to assign Keith Lovas as Project Manager, Plaintiffs and Hollister entered into an Amendment to the Contract ("Amendment"), which Amendment continued to require, in part, that Hollister bond or otherwise discharge all lien claims filed by Hollister's subcontractors as required by the Contract and further confirmed and required Hollister to pay timely all of its  subcontractors used on the Project.

86.     Additionally, as Plaintiffs were to turn over space in the Building to tenants by a certain date, the Amendment further provides that Hollister would achieve substantial completion

of the 5th, 6th and 7th floors no later than February 28, 2019, and substantial completion of the remainder of the Project no later than April 16, 2019.

87.    Hollister was also to obtain a Temporary Certificate of Occupancy ("TCO") for the Building no later than April 16, 2019.

88.    To achieve compliance with the dates set forth in the Amendment, by January 29, 2019, Hollister was to provide an updated schedule containing mutually agreed upon interim construction milestones for which time was of the essence.

89.    The Amendment further set up an escrow account in which Hollister deposited the sum of $1,000,000.00 to secure Hollister's obligation to timely pay all amounts payable by Hollister to subcontractors, vendors and suppliers, and to reimburse Plaintiffs for their portion of the disputed amount paid by Plaintiffs that were either subsequently agreed to by the parties or awarded to Plaintiffs.  Additionally, Plaintiffs had the right to withdraw funds to pay Hollister subcontractors should Hollister fail to pay said subcontractors.

90.    The Amendment further provided that Plaintiffs had the right to terminate Hollister should Hollister fail to maintain the completion schedule set forth therein, and Hollister would reimburse Plaintiffs for all costs in excess of the GMP to complete the work in addition to liquidated damages.

91.    The Amendment further required Hollister to perform a GMP analysis and identify all disputed change orders.

92.    Hollister failed to abide by its responsibilities.

**F.  Post Amendment – Discovery of Hollister's Misrepresentations and Mismanagement**

93.    The subcontractors retained by Hollister to escalate the construction activities later informed Plaintiffs that they were retained at a higher "time and materials" fee arrangement, and

that Hollister had no intent on paying them.  Instead, Hollister advised them to seek payments from Plaintiffs.

94.     On January 29, 2019, Leslie filed a lawsuit as against Hollister and Plaintiffs which lawsuit sought to foreclose on the Leslie Construction Lien.

95.     As of February of 2019, Hollister had yet to complete certain duct, plumbing, floors, ceilings, walls, glass installation, fireproofing, bathroom, countertop, pits, window, stair, lighting, painting, and concrete work, as well as certain inspections.

96.     Despite Plaintiffs' requests, Hollister failed to accelerate the Project by hiring additional subcontractors and workers to complete the construction activities in a timely fashion.

97.     It became readily apparent to Plaintiffs that, despite its assurances from the Hollister Officers otherwise, Hollister had no intent on timely completing the Project and complying with any construction schedule issued.

98.     On February 25, 2019, as a result of non-payment of its invoices, MixOnSite USA, Inc. ("MixOnSite"), a Hollister subcontractor, filed a Construction Lien on the property in the amount of $312,932.50.

99.     In late February  of 2019, after Plaintiffs issued a non-compliance report for the electrical work and after serious delays on the part of Hollister's electrical subcontractor Starlite Electric, LLC ("Starlite"), Plaintiff demanded a meeting with Hollister and Starlite.  At this meeting, Starlite advised Plaintiffs that said subcontractor did not have the financial ability to complete its work at the Project.  Starlite and Hollister advised that that Starlite had not paid its suppliers hundreds of thousands of dollars despite having provided Plaintiffs with a lien waiver to the contrary.  Hollister's solutions was to have Plaintiffs pay Starlite weekly to fund this operation despite the apparent fraud, delays and poor workmanship on the part of Starlite.  Plaintiffs refused

this suggestion and directed Hollister to replace Starlite.  Hollister refused to replace Starlite and, as result, Plaintiffs were forced to retain an electrical subcontractor ("ECG") to complete the remainder of the electrical work at the Project.  Hollister later concurred with this decision.

100.    As of March 1, 2019, Hollister had not achieved substantial completion of the 5th, 6th and 7th floors as required by the Amendment.

101.    Shortly thereafter, ECG advised Plaintiffs that a portion of Starlite's work was defective and needed to be redone by ECG to bring it up to code.

102.    On or about March 28, 2019, as a result of non-payment of its invoices, Graybar Electric Company, Inc. ("Graybar"), a supplier to Hollister subcontractor Starlite, filed a Construction Lien as against the property in the amount of $452,850.06.

103.    On March 29, 2019, Hollister, through its counsel, provided Plaintiffs with "proof" that it had bonded the Control liens to the amount of $831,746.28.  Specifically, it provided a partially signed Bond to Release a Construction Lien Claim.  Plaintiffs were later made aware that said bond had not been properly executed and filed and, as such, same was meaningless.

104.    As of April 1, 2019, Hollister had failed to achieve substantial completion of the 5th, 6th and 7th floors, which substantial completion date had been extended to February 28, 2019 pursuant to the Amendment.

105.    In May of 2019, at a meeting with Hollister and its roofing subcontractor, Plaintiffs became aware that more than 1,000 penetrations had been made to the newly applied roof membrane as a result of installing the glass railing shoe out of sequence.  This resulted in the manufacturer's denial of the contractually required thirty (30) year warranty.  Hollister's roofing subcontractor advised that Hollister had knowledge of this condition for months and that Hollister failed to take any actions to address said condition.

106.     Plaintiffs demanded that Hollister cure this condition.  Hollister did not take any measures to address or cure this condition.  As such, Plaintiffs were forced to retain subcontractors to remedy the roof penetration issues.

107.     Moreover, due to payments made by Plaintiffs from the escrow account as a result of Hollister's continued failure to pay its subcontractors, as of May 31, 2019, the funds from the escrow account had been exhausted.

108.     On June 4, 2019, Graybar filed a Complaint as against Hollister and Defendants which sought to foreclose on its Construction Lien.

109.     As of July of 2019, Plaintiffs had already paid more than $3,000,000.00 in excess of the GMP for the Project.

110.     In July of 2019, as a result of Hollister's failure to address the penetrations in the roof membrane, Plaintiffs were forced to retain a contractor to remedy this defective condition.

111.     Additionally, Hollister still had not provided the GMP reconciliation nor had it provided proof that the Construction Liens placed against the property had been bonded as required by the Contract and the Amendment.  Instead, Hollister's Officers continued to maintain that the Construction Liens had been bonded.

112.     As of the end of June of 2019, as a result of Hollister's continued failure to pay its subcontractors, all funds from the escrow had been utilized.

113.     On July 2, 2019, MixOnSite filed a Complaint as against Hollister and Plaintiffs which sought to foreclose on its Construction Lien.

114.     On July 11, 2019, based on Hollister's apparent abandonment of the Project, Plaintiffs issued Hollister a Notice of Termination.  The Notice stated that (1) still was not paying its subcontractors but, instead, directing its subcontractors to seek payments from Plaintiffs, (2)

failed to bond the Construction Liens placed as against the property, and (3) failed to properly staff the Project. The Notice of Termination demanded that Hollister pay Plaintiffs $1,000,000.00 in order for Hollister to remain on the Project.

115. On July 16, 2019, based on the non-payment of its invoices, Sunny Brook Concrete filed a Notice of Intent to file a Construction Lien on the property in the amount of $108,972.85. Hollister had previously advised that this subcontractor had been paid.

116. On July 25, 2019, based on the non-payment of its invoices, Sunbelt Rentals – Region 11 filed a Notice of Intent to file a Construction Lien on the property in the amount of $27,766.32.

117. On August 1, 2019, based on the non-payment of its invoices, City Contracting, Inc. ("City Contracting") filed a Construction Lien as against the property in the amount of $167,680.51.

118. On August 13, 2019, based on the non-payment of its invoices, Environmental Devices, Inc. ("Environmental Devices") filed a Construction Lien as against the property in the amount of $59,230.00.

119. As the result of Hollister's nonpayment to its subcontractors, it became readily apparent to Plaintiffs that Hollister retained its subcontractors with the intent of making it seem that Hollister was trying attempting to comply with its contract terms, but Hollister had no intent to pay any of these subcontractors as required by the Contract. Despite Hollister's repeated assurances that its subcontractors would be paid, Plaintiffs are continually being made aware of additional Construction Liens being filed as against the property.

120. Accordingly, on September 5, 2019, Plaintiffs issued a formal and final Notice of Termination for Cause directing Hollister to leave the project.

121.    As of the filing of the instant Complaint by Plaintiffs, construction on the Project has yet to be completed.

122.    By the time construction on the Project is completed, Plaintiffs expect that they would have paid in excess of $7,000,000.00 above and beyond what Plaintiffs were to pay Hollister pursuant to the GMP.

123.    Moreover, Plaintiffs are now litigating certain Construction Lien foreclosure lawsuits, and expect to litigate more lawsuits to be filed as the result of recently filed Construction Liens.

124.    Plaintiffs' over payment in construction costs and litigation costs are the sole result of Hollister's, Johnson's, Flanagan's and Murray's mismanagement of the Project.  Absent said mismanagement, the Project would have been timely completed and completed within the monetary parameters of the GMP.

125.    Hollister breached its obligations and failed to comply with the terms of the Contract and the Amendment by not completing the Project pursuant to the construction schedule, not paying certain subcontractors and suppliers, and by not bonding certain lien claims.

126.    But for one Change Order, which Plaintiffs rejected and which was re-issued with no extensions of time, Hollister never requested any other formal extensions of time from Plaintiffs and never formally put Plaintiffs on notice of any delays to the schedule.

127.    Hollister, Johnson, Flanagan and Murray committed fraud by retaining subcontractors with no intent of paying them and by falsely stating that it was bonding the lien claims, by not notifying Plaintiffs of certain construction defects in the roof, electric, window testing/altering work, and by not paying Hollister's subcontractors thought Hollister had received payment for same from Plaintiffs.

128.    Based on the actions of Hollister, Johnson, Flanagan and Murray, Plaintiffs have been damaged in excess of $7,000,000.00.

### G.  Subcontractor Liens

129.    As of the filing of the instant Complaint, Atlantic has a Construction Lien on the property in the amount of $340,315.00.

130.    Control has a Construction Lien against the property in the amount of $831,746.28.

131.    Drobach has a Construction Lien on the property in the amount of $50,092.83.

132.    Apple has a Construction Lien on the property in the amount of $471,082.80.

133.    Leslie has a Construction Lien on the property in the amount of $936,640.32.

134.    MixOnSite has a Construction Lien on the property in the amount of $312,932.50.

135.    Graybar filed a Construction Lien as against the property in the amount of $452,850.06.

136.    City Contracting has a lien against the property in the amount of $167,680.51.

137.    Environmental Devices has a lien against the property in the amount of $59,230.00.

138.    Drobach, Apple, Leslie, MixOnSite and Graybar have filed lawsuits to foreclose on their Construction Liens.

139.    Sunny Brook Concrete and Sun Belt Rentals have filed Notices of Intent to file Construction Liens.

140.    Plaintiffs anticipate that there will be additional subcontractor Construction Liens placed on the property which arise out of the Project.

**FIRST COUNT**
**AS AGAINST ALL DEFENDANTS**
**(BREACH OF CONTRACT: FAILURE TO TIMELY COMPLETE THE PROJECT)**

141.    Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 140 as if fully set forth herein.

142.    Pursuant to the Contract, Hollister was required to substantially complete construction of the Project no later than September 1, 2018.

143.    Thereafter, Plaintiffs granted Hollister an extension of time and, by way of the Amendment, permitted Hollister to reach substantial completion of the 5th, 6th and 7th floors no later than February 28, 2019 and substantial completion of the remainder of the Project no later than April 16, 2019.

144.    Hollister breached both the Contract and the Amendment in that it failed to meet the deadlines set forth in both the Contract and the Amendment.

145.    In fact, as of the filing of the instant Complaint, the Project has not been completed.

146.    Hollister's failure to meet these deadlines are the sole result of Hollister's mismanagement of the Project.

147.    Johnson, Flanagan and Murray are responsible for Hollister's delays as they were involved in the management of the Project on behalf of Hollister.

148.    Upon information and belief, John Does 1-100, Jane Does 1-100 and XYZ Corporations 1-100, acted in concert with Defendants to breach the contract.

149.    As a direct and proximate cause of Hollister's failure to timely complete the Project, Plaintiffs have suffered and will continue to suffer damages related to increased construction costs arising out of payments for extended general conditions to other persons and/or entities and increased subcontractor fees.

24

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.  Compensatory and consequential damages;

b.  Interest and costs of suit; and

c.  Such other relief as deemed equitable, appropriate and just by the Court.

**SECOND COUNT**
**AS AGAINST ALL DEFENDANTS**
**(BREACH OF CONTRACT: FAILURE TO BOND LIENS)**

150.  Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 149 as if fully set forth herein.

151.  Pursuant to Section 12.9 of the Contract, if a subcontractor filed or caused to be filed any lien against the Project, then Hollister, at its sole cost and expense, was to cause such lien to be canceled and discharged of record by payment, bonding or otherwise.

152.  The Amendment also required that Hollister bond or otherwise discharge all lien claims filed by Hollister's subcontractors.

153.  Hollister failed to bond all of the lien claims filed by Control, Drobach, Apple Coring, Leslie, Sunny, Graybar, MixOnSite, Sunbelt, City Contracting, Environmental Devices and LAN Exteriors.

154.  As a result of Hollister's failure to bond or otherwise discharge these liens, Plaintiffs have suffered and will continue to suffer damages related to litigation costs arising out of lien foreclosure lawsuits and the decreased equity in the fair market value of the property, the latter of which will affect Plaintiffs' ability to finance the property.

155.  Johnson, Flanagan and Murray are responsible for Hollister's actions as they were involved in the management of the Project on behalf of Hollister.

156.     Upon information and belief, John Does 1-100, Jane Does 1-100 and XYZ Corporations 1-100, acted in concert with Defendants to induce Hollister not to bond the liens.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.     Compensatory and consequential damages;

b.     Interest and costs of suit; and

c.     Such other relief as deemed equitable, appropriate and just by the Court.

### THIRD COUNT
### AS AGAINST ALL DEFENDANTS
### (BREACH OF CONTRACT: FAILURE TO PAY SUBCONTRACTORS)

157.     Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 156 as if fully set forth herein.

158.     Pursuant to Section 12.2 of the Contract, Hollister was required to pay all subcontractors and suppliers utilizing the funds paid to it by Plaintiffs.

159.     The Amendment also required that Hollister made said payments in a timely manner to its subcontractors.

160.     Hollister failed to pay certain subcontractors.  Moreover, it is apparent that Hollister retained certain subcontractors at escalated costs without any intent to pay them for their services.

161.     As a result of Hollister's failure to pay certain subcontractors, Plaintiffs have suffered and will continue to suffer damages related to litigation costs arising out of liens being placed against the property and subcontractor lawsuits against Plaintiffs seeking payment of the subcontractors' invoices.

162.     Johnson, Flanagan and Murray are responsible for Hollister's actions as they were involved in the management of the Project on behalf of Hollister.

163.    Upon information and belief, John Does 1-100, Jane Does 1-100 and XYZ Corporations 1-100, acted in concert with Defendants to induce Hollister not to pay its subcontractors.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

    a.   Compensatory and consequential damages;

    b.   Interest and costs of suit; and

    c.   Such other relief as deemed equitable, appropriate and just by the Court.

**FOURTH COUNT:**
**AS AGAINST ALL DEFENDANTS**
**(NEGLIGENCE: CONSTRUCTION DEFECTS)**

164.    Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 163 as if fully set forth herein.

165.    Hollister's subcontractors negligently and improperly performed the roof membrane work which resulted in over 1,000 penetrations to the roofing membrane.

166.    Hollister's subcontractors negligently and improperly performed certain electrical work which resulted in said work not meeting applicable codes and/or regulations.

167.    Hollister's subcontractors negligently and improperly performed the window installation and/or window testing.

168.    Pursuant to Section 2.2.2 of the Contract, Hollister was solely responsible for all construction means, methods, techniques, sequences and procedures for the construction activities and, as such, Hollister is responsible for the defective construction work performed by its subcontractors.

169.    Hollister had knowledge of the construction defects and failed to take any actions to remedy same.

170.    Johnson, Flanagan and Murray are responsible for Hollister's actions as they were involved in the management of the Project on behalf of Hollister.

171.    Upon information and belief, John Does 1-100, Jane Does 1-100 and XYZ Corporations 1-100, acted in concert with Defendants to induce Hollister not to remedy the construction defects.

172.    As a result of the construction defects, Plaintiffs have suffered and will continue to suffer damages related remediation costs to cure the defective conditions.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.    Compensatory and consequential damages;

b.    Interest and costs of suit; and

c.    Such other relief as deemed equitable, appropriate and just by the Court.

**FIFTH COUNT:**
**AS AGAINST ALL DEFENDANTS**
**(FRAUD IN THE INDUCEMENT)**

173.    Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 172 as if fully set forth herein.

174.    In negotiating the Amendment, Johnson and Murray, on behalf of Hollister, affirmed that Hollister was ready and capable of complying with an agreed upon construction schedule and would properly staff the Project, that Hollister would timely pay all subcontractors, and would bond or otherwise discharge any and all liens arising out of the Project.

175.    After the signing of the Amendment and through the continued construction activities, it became apparent that Johnson, Flanagan, Murray and Hollister had no intent of complying with an agreed upon construction schedule, properly staffing the Project, timely paying all of its subcontractors, and bonding or otherwise discharging any and all liens arising out of the Project.

176.    Instead, the statements and misrepresentations made by Johnson, Flanagan, Murray, and Hollister were made with the sole purpose of convincing Plaintiffs not to terminate Hollister for cause so that Hollister could receive additional monetary payments from Plaintiffs.

177.    Plaintiffs reasonably relied on the statements and misrepresentations made by Johnson, Flanagan, Murray and Hollister to their detriment.  But for those statements and misrepresentations, Plaintiffs would have terminated Hollister for cause and completed the contract in a timely manner, and would not have had to pay in excess of $7,000,000.00 to complete the Project.

178.    As a direct and proximate cause of  the statements and misrepresentations of Johnson, Flanagan, Murray and Hollister in convincing Plaintiffs to sign the Amendment, Plaintiffs have suffered and will continue to suffer damages related to increased construction costs arising out of payments for extended general conditions to other persons and/or entities and increased subcontractor fees.

179.    Upon information and belief, John Does 1-100, Jane Does 1-100 and XYZ Corporations 1-100, acted in concert with Defendants to commit the fraudulent acts complained of herein.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.      Compensatory, consequential and punitive damages;

b.      Interest and costs of suit; and

c.      Such other relief as deemed equitable, appropriate and just by the Court.

**SIXTH COUNT:**
**AS AGAINST ALL DEFENDANTS**
**(WILLFUL AND WANTON CONDUCT)**

180.    Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 179 as if fully set forth herein.

181.    Hollister knew that its mismanagement of the Project, in failing to comply with schedules, failing to properly staff the Project, failing to pay its subcontractors, and failing to bond or otherwise discharge the liens arising out of the Project, would result in monetary damages to Plaintiffs in the form of increased construction costs, the diminution of value of its property, and litigation fees arising out of construction lien foreclosure lawsuits.

182.    Hollister acted in reckless disregard with regard to the consequences of its actions in its intentional mismanagement of the Project.

183.    Hollister acted in reckless disregard to the consequences of its actions in its intentional failure to pay its subcontractors and intentional failure to bond or otherwise discharge the constructions liens which arose out of the Project.

184.    Johnson, Flanagan and Murray are responsible for Hollister's actions as they were involved in the management of the Project on behalf of Hollister.

185.    Upon information and belief, John Does 1-100, Jane Does 1-100 and XYZ Corporations 1-100, acted in concert with Defendants to induce Johnson, Murray and Hollister to act in a willful and wanton manner.

186.    As a direct and proximate cause of the willful and wanton conduct of Defendants, Plaintiffs have suffered and will continue to suffer damages related to increased construction costs arising out of payments for extended general conditions to other persons and/or entities, increased subcontractor costs, remediation costs and litigation costs.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.    Compensatory, consequential and punitive damages;

b.    Interest and costs of suit; and

c.    Such other relief as deemed equitable, appropriate and just by the Court.

**SEVENTH COUNT:**
**AS AGAINST JOHNSON, FLANAGAN, MURRAY,**
**JANE DOE 1-100, JOHN DOE 1-100**
**(TORTIOUS CONDUCT OF CORPORATE OFFICERS)**

187.   Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 186 as if fully set forth herein.

188.   Johnson, Flanagan, and Murray are officers of Hollister.

189.   Johnson, Flanagan, and Murray knowingly, willingly and actively took part in the commission of the torts committed by Hollister in its management of the Project.

190.   For example, but not limited to, Johnson, Flanagan, and Murray knowingly, willingly and actively took part in the negligent and fraudulent actions of Hollister in the execution of the Contract and Amendment, in Hollister's failure to pay its subcontractors, in Hollister's failure to properly staff the Project, and in Hollister's failure to bond or otherwise discharge the liens placed on the Property.

191.   As such, Johnson, Flanagan, and Murray are personally liable for Plaintiffs' damages pursuant to the participation theory of personal liability.

192.    Upon information and belief, John Does 1-100 and Jane Does 1-100 are corporate officers knowingly, willingly and actively took part in the commission of the torts committed by Hollister in its management of the Project.

193.    Plaintiffs' damages arising out of Johnson, Flanagan, Murray, John Doe 1-100, and Jane Doe 1-100's personal involvement in the commission of Hollister's tort are increased construction costs arising out of payments for extended general conditions to other persons and/or entities, increased subcontractor costs, remediation costs and litigation costs.

**WHEREFORE**, Plaintiffs demand judgment Johnson, Flanagan, Murray, John Doe 1-100, and Jane Doe 1-100 awarding:

a.    Compensatory, consequential, and punitive damages;

b.    Interest and costs of suit; and

c.    Such other relief as deemed equitable, appropriate and just by the Court.

## EIGHTH COUNT:
## AS AGAINST ALL DEFENDANTS
## (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

194.    Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 193 as if fully set forth herein.

195.    Defendants had an implied duty of good faith and fair dealing in the execution of their contractual duties.

196.    Defendants breached their implied duty of good faith and fair dealing by acting in a manner which had the effect of causing damages to Plaintiffs.

197.    These breaches include Defendants' failure to comply with the project completion dates, failure to properly staff the project, failure to pay the subcontractors and failure to bond or otherwise discharge the liens arising from the Project.

198.    As a direct and proximate result of Defendants' breaches, Plaintiffs suffered damages in the form of increased construction costs arising out of payments for extended general conditions to other persons and/or entities, increased subcontractor costs, remediation costs and litigation costs.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.   Compensatory, consequential, and punitive damages;

b.   Interest and costs of suit; and

c.   Such other relief as deemed equitable, appropriate and just by the Court.

**NINTH COUNT:**
**AS AGAINST ALL DEFENDANTS**
**(INTENTIONAL MISREPRESENTATION DEFECTS)**

199.    Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 198 as if fully set forth herein.

200.    As more fully set forth herein, Defendants intentionally made various material misrepresentations including, but not limited to, that Hollister had bonded certain liens placed on the property, Hollister would timely pay all of its subcontractors, Hollister would meet the Project's deadlines, and that Hollister would properly staff the Project.

201.    Defendants' misrepresentations were made knowingly and willfully, and with the intent to induce Plaintiffs to rely thereon.

202.    The misrepresentations and omissions made by Defendants were false when made, and Defendants knew them to be false at the time they were made.

203.    Upon information and belief, John Does 1-100, Jane Does 1-100 and XYZ Corporations 1-100, acted in concert with Defendants to induce Defendants to make said misrepresentations.

204.    As a direct, proximate and foreseeable result of the misrepresentations and omissions of Defendants, Plaintiffs have sustained damages relating to increased construction costs, the diminution of the value of its property, and litigations costs arising out of the lien foreclosure lawsuits.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.  Compensatory, consequential, and punitive damages;

b.  Interest and costs of suit; and

c.  Such other relief as deemed equitable, appropriate and just by the Court.

## TENTH COUNT:
## AS AGAINST ALL DEFENDANTS
## (NEGLIGENT MISREPRESENTATION)

205.    Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 204 as if fully set forth herein

206.    Defendants negligently made various material misrepresentations including, but not limited to, that Hollister had bonded certain liens placed on the property, Hollister would timely pay all of its subcontractors, Hollister would meet the Project's deadlines, and that Hollister would properly staff the Project.

207.    Defendants also negligently misrepresented that they would pay all subcontractors they were using to attempt to recover the delays, but Hollister failed to abide by that promise.

208.    As a direct, proximate and foreseeable result of the misrepresentations and omissions of Defendants, Plaintiffs have sustained damages relating to increased construction costs, the diminution of the value of its property, and litigations costs arising out of the lien foreclosure lawsuits in amounts that have yet to be determined.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.   Compensatory, consequential, and punitive damages;

b.   Interest and costs of suit; and

c.   Such other relief as deemed equitable, appropriate and just by the Court.

<strong><u>ELEVENTH COUNT:</u></strong><br><strong><u>AS AGAINST ALL DEFENDANTS</u></strong><br><strong>(CONSUMER FRAUD ACT: <em>N.J.S.A.</em> 56:8–2)</strong>

209.    Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 208 as if fully set forth herein.

210.    At all relevant time, Defendants employed unconscionable commercial practices, including but not limited to, deception, fraud, false pretense, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts with regard to the sale of the pavers and windows to Plaintiffs, with the intent that Plaintiffs rely on said false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts.

211.    More specifically, as part of the GMP, Hollister was required to supply certain merchandise, including pavers to be used at Project.  Plaintiffs reminded Hollister of its contractual requirement to supply the pavers, and Hollister confirmed that it would order and pay for the

pavers. Plaintiffs later learned that Hollister never paid for the pavers and said merchandise was ordered by Plaintiffs, resulting in duplicative costs being borne by Plaintiffs.

212.   Additionally, Hollister was required to supply certain merchandise, including windows to be used on the Project as specified. Thereafter, Hollister made misrepresentations as to the quality of the windows Hollister actually supplied.  In fact, Hollister made recommendations for a substitute window product, representing that Hollister's suggested substitute window product was the same or superior to the item specified.  In actuality, the windows recommended and supplied by Hollister were an inferior product that failed.

213.   Upon information and belief, Defendants John Does 1-100, Jane Does 1-100 and XYZ Corporations 1-100, acted in concert with Defendants to induce Defendants to use unconscionable commercial practices consisting of deception, fraud, false pretense, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts with regard to the sale of merchandise, including the pavers and windows to Plaintiffs, with the intent that Plaintiffs rely on said false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts.

214.   As a result of Defendants' unconscionable commercial practices consisting of deception, fraud, false pretense, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts with regard to the sale of the pavers and windows, as well as, potentially other items, Defendants have breached the provisions of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–2, and Plaintiffs have sustained substantial damages including increased construction costs.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.   Compensatory, consequential, treble, and punitive damages;

b.   Interest and costs of suit; and

c.   Such other relief as deemed equitable, appropriate and just by the Court.

## TWELFTH COUNT:
## AS AGAINST JANE DOES, JOHN DOES, XYZ CORPORATIONS
### (ALTER EGO/CORPORATE VEIL)

215.   Plaintiffs repeat and re-allege every allegation set forth above in paragraphs 1 through 214 as if fully set forth herein.

216.   Hollister is being operated as a mere instrumentality and corporate alter ego of Defendants Murray, Flanagan and Johnson, John Does 1-100, Jane Does 1-100, and XYZ Corporations 1-100.

217.   Upon information and belief, at all relevant times, Defendants Hollister, Murray, Flanagan, and Johnson, John Does 1-100, Jane Does 1-100, and XYZ Corporations 1-100 were in control and said Defendants maintained common ownership, common management, commingling of funds, operations in each other's names and the fraudulent and the injurious consequences to Plaintiffs arising out of the close relationships between the Defendants.

218.   Upon information and belief, at all relevant times, Defendants Hollister, Murray, Flanagan, and Johnson, John Does 1-100, Jane Does 1-100, and XYZ Corporations 1-100 transferred assets, opportunities or corporate ventures to other individuals or entities that should have been the assets, opportunities and/or corporate ventures of Defendant Hollister in order to avoid creditors.

219.   Upon information and belief, John Does 1-100, Jane Does 1-100 and XYZ Corporations 1-100, acted in concert with Defendants to perpetuate a fraud or injustice upon Plaintiffs.

220.    In light of the foregoing, Defendants did not abide by the corporate structure and, as a result, the corporate veil should be pierced. By virtue of the foregoing, Defendants are all jointly and severally liable for the debts of the Company and for any award entered against the Defendants in this action.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against all Defendants awarding:

a.  Compensatory, consequential, and punitive damages;

b.  Interest and costs of suit; and

c.  Such other relief as deemed equitable, appropriate and just by the Court.

## DESIGNATION OF TRIAL COUNSEL

Loryn Riggiola, Esq. of Zetlin & De Chiara, LLP is hereby designated as trial counsel on behalf of Plaintiffs in this matter.

> **ZETLIN & DE CHIARA LLP**
> Attorneys for Plaintiffs
> *Newark Warehouse Urban Renewal, LLC and Newark Warehouse Redevelopment Company, LLC*

By:   */s/ Loryn Riggiola*
　　　LORYN RIGGIOLA

Dated: September 5, 2019

## CERTIFICATION

Plaintiffs hereby certifies pursuant to <u>R.</u> 4:5-1 that there are other civil proceedings either pending or contemplated with respect to the matter in controversy herein.  Known proceedings are as follows:

1. *Drobach Equipment Rental Co., v. Control Services, LLC, et al.* UNN-L-297-19
2. *MixOnSite USA, Inc. v. Newark Warehouse, et al.*
   ESX-L-4884-19
3. *Leslie Katchen Steel Const. Inc. v. Hollister Constr., LLC, et al.*
   ESX-762-19
4. *Apple Coring & Sawing, LLC v. Control Services, LLC, et al.*
   ESX-L-4707-18
5. *Control Services, LLC v. Hollister Constr., LLC, et al.*
   ESX-L-246-19
6. *Graybar Electric Co., Inc. v. Newark Warehouse Urban Renewal, et al.*
   ESX-L-4118-19

## DEMAND FOR JURY

Plaintiffs hereby demand a trial by jury as to all issues.

**ZETLIN & DE CHIARA LLP**
Attorneys for Plaintiffs
*Newark Warehouse Urban Renewal, LLC and Newark Warehouse Redevelopment Company, LLC*

By: **/s/ Loryn Riggiola**
LORYN RIGGIOLA

Dated: September 5, 2019